

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEAST DIVISION

RUBEN CROSS,

    Plaintiff(s),

vs.

ROADWAY EXPRESS, INC.,

    Defendant(s).

]
]
]
]
]  CV-01-CO-02365-NE
]
]
]
]

**ENTERED**

MAR 3 1 2004

MEMORANDUM OF OPINION

## I.   INTRODUCTION.

This is an action brought pursuant to Title VII of the Civil Rights Act of 1964. The Court has for consideration a motion for summary judgment or partial summary judgment, filed November 7, 2002, by defendant Roadway Express, Inc. (hereinafter, "Roadway"). [Doc. 48.] Also before the Court is Roadway's motion to exclude the EEOC determination, filed January 16, 2003. [Doc. 61.] The issues have been briefed and are now ripe for decision. Upon due consideration, and for the reasons set out below, the motion to exclude the EEOC determination will be granted.  The motion for summary

judgment will be granted.  The motion for partial summary judgment is moot.

## II.    SUMMARY JUDGMENT STATEMENT OF FACTS.[1]

The defendant, Roadway, is a trucking company that hauls freight to and from various locations in the United States.  Plaintiff's Brief, Doc. 58, (hereinafter, "Pl's Br.") p. 1; Defendant's Brief, Doc. 54, (hereinafter, "Def's Br.") p. 2.  The plaintiff, Ruben Cross (hereinafter, "Cross"), is an African-American male employed by Roadway since November 1, 1987, as a full-time driver at its Huntsville terminal.  Pl's Br. p. 1; Def's Br. pp 3-4. He began working at Roadway in June 1987 as a "casual" or part-time truck driver.  *Id.*

The Huntsville terminal manager at all pertinent times was Stanley Shanks.  Pl's. Br. p. 1; Def's. Br. p. 2.  Shanks supervises the dock supervisors and the dispatchers at the Huntsville terminal.  *Id.*  Nathan

---

[1]In developing the facts for this opinion, the Court considered the facts proposed by the parties in their briefs and the Court's own examination of the record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Rozea and Jeff Gordon were dock supervisors, responsible for supervising the correct loading and unloading of freight by the drivers.  Pl's. Br., p. 2; Def's. Br. p. 2; Phil Massey was a dispatcher, responsible for planning deliveries and pickups.  *Id*.

## III.   THE MOTION TO EXCLUDE.

On October 6, 2000, Cross filed a charge of discrimination with the EEOC.   Plaintiff's Summary Judgment Exhibits, Doc. 56 (hereinafter, "Pl's Ex."), Ex. 12.   The charge was amended on November 21, 2000, and February 27, 2001.  *Id*.  The EEOC issued a right-to-sue letter on January 25, 2002, but indicated it would continue to process the charge.  Doc. 76, Ex. 2.  Cross initiated this action on September 20, 2001.  On September 23, 2002, the EEOC issued its determination that there was "reasonable cause to believe that [Roadway] discriminated against [Cross] with respect to discriminatory discipline, job assignment, assignment of equipment, denial of awards and exclusion from safety meetings."  Pl's Ex. 14.  The EEOC also determined that Roadway discriminated against Cross and "[b]lacks as a class by subjecting them to a racially hostile work environment, denying them equal promotional opportunities to supervisory positions, assignment

to less favorable jobs, unequal assignment of equipment and discriminatory discipline." *Id.*

Roadway contends the EEOC determination should be excluded under Fed. R. Evid. 803(8) because it is hearsay which does not meet the "trustworthiness" requirements for admission of public documents, under Rules 401 and 403 because it is irrelevant, and under Rule 403 because it is more prejudicial than probative.

The EEOC's final decision regarding a claim of discrimination is admissible under Fed. R. Evid. 803(8)(C), providing for admissibility of public records and reports setting forth factual findings resulting from an investigation made pursuant to authority granted by law, unless the source of information or other circumstances indicate lack of trustworthiness. *Chandler v. Roudebush*, 425 U.S. 840, n.39 (1976).  However,

> [t]he admission of an EEOC report, in certain circumstances, may be much more likely to present the danger of creating unfair prejudice in the minds of the jury than in the mind of the trial judge, who is well aware of the limits and vagaries of administrative determinations and better able to assign the report appropriate weight and no more.

*Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995),

*citing Barfield v. Orange County,* 911 F.2d 644, 651 (11th Cir. 1990) and

*Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304, 1309 (8th Cir. 1984)

(for the proposition that "EEOC reports are not homogenous products but

may vary greatly in quality and factual detail"). Thus, in the Eleventh

Circuit, EEOC determinations are generally admissible in bench trials, but

are subject to more limited admissibility in jury trials. *Walker*, 53 F.3d at

1554.[2] "In particular, the difference between a bench and a jury trial may

affect the district court's analysis of a determination letter's admissibility

under Federal Rules of Evidence 403." *Id.* The decision concerning

admissibility of the EEOC's determination letter, as with any evidence, is

committed to the broad discretion of the trial court and will be reversed

only upon a clear showing of abuse of discretion. *Id.* The district court

must make the admissibility determination on an individual basis,

---

[2]The plaintiff argues that this summary judgment proceeding is more akin to a bench trial, and that the Court should not consider the prejudicial weight of the evidence as if it were presented to a jury. However, in ruling on a summary judgment motion, this Court must determine if there is a genuine question of material fact necessitating a trial. That exercise would be futile if the Court considered evidence which the jury could not consider.

considering the evidence's probative value and the danger of unfair prejudice. *Latham v. Dep't of Children and Youth Svcs.*, 172 F.3d 786, 791 (11th Cir. 1999).

Being mindful of this Court's duty to assure the full availability of the judicial forum in employment discrimination cases, *Walker*, 53 F.3d at 1554, the Court finds the probative value of the EEOC determination letter is outweighed by the danger of unfair prejudice. The letter includes only the conclusion of the district director, without even minimal details about the investigative procedure used or the data considered. Without some indicator of the basis for the determination, this Court cannot conclude that the EEOC's sources of information were trustworthy, that the investigation was timely, or that a hearing was held. *See* Rule 803(8)(C), and Advisory Comments. Certainly, the lack of supporting detail limits the probative value of the determination. Given the minimal probative value of the submission and the danger that the jury will place undue emphasis on the determination, the Court finds the determination should be excluded pursuant to Fed. R. Evid. 403.

IV.   SUMMARY JUDGMENT STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or

by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## V.   DISCUSSION.

Cross claims he was subject to disparate treatment due to his race while employed at Roadway. Specifically, he claims he was treated differently with respect to job assignments, equipment access, and discipline. Pl's. Br. pp. 2-3, 12-20, 24-27, 45-49. He also claims he was subjected to a hostile work environment at Roadway.[3] Pl's. Br. pp. 2-3, 3-7,

---

[3]Cross expressly abandoned any claim of retaliation. Pl's. Br. p. 3. Further, Roadway moved for summary judgment as to Cross's disparate treatment claims related to hours and overtime, recognition and awards, safety meetings and holiday work schedules. Def's. Br. pp. 7-9. Cross did not address these claims in his responsive submission. Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); See *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990)("[p]resenting . . . arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court"). Accordingly, Cross's unaddressed claims will be dismissed without further discussion.

27-31, 31-39.  Roadway contends it is entitled to summary judgment as to

all of Cross's claims.

### A.  Disparate Treatment.

Under the burden-shifting *McDonnell-Douglas* framework,[4] a plaintiff

---

[4]The plaintiff has not pointed to any direct evidence of discrimination, and relies on circumstantial evidence presented under the framework established in *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973), as modified in *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).  *See Chapman v. A1 Transporation*, 229 F.3d 1012, 1024 (11th Cir. 2000)(en banc).

In discussing his disparate treatment claims, Plaintiff makes frequent reference to Nathan Rozea's testimony, affidavit, and declaration. Pl's. Br. pp. 12-20. Many of the citations reference Rozea's repetition of statements Shanks or Massey made in his presence.  For example, Rozea testified that Shanks instructed him to treat black and white employees differently.  Rozea Dep., Pl's. Ex. 3, pp. 239, 448.  This testimony is admissible to show that Shanks made the statement, and can serve as evidence of pretext or motive.  *See McDonnell Douglas*, 411 U. S. 792, 800-05 (1973)(discussing the order and allocation of proof in a "private, non-class action challenging employment discrimination," setting forth the prima facie case which must be established by the plaintiff and noting that evidence of employer's general policy and practices would be relevant to prove pretext).  However, the evidence is hearsay if offered to show the truth of Shanks' statement, *i.e.*, that blacks and whites were treated differently at Roadway or that plaintiff was treated in a discriminatory manner.  Thus, Rozea's testimony about Shanks and Massey's statements is incompetent to prove any element of the plaintiff's prima facie case.  *See* Rozea Dep. pp. 74-85, 200-10, 239, 364-70,448; Rozea 1/18/02 Affidavit ¶¶ 17, 16, 4, 5, 14, 18, 10, 6; Rozea 9/10/02 Declaration, ¶¶ 4, 6, 7, 8, 9.

Plaintiff also relies on anecdotal evidence of other employee's experiences at Roadway. Pl's. Br. pp. 14-24, citing Rozea Dep. pp. 29-33, 37-48, 49-55, 56-70, 74-85, 198-200, 200-10, 239, 333-36, 343-62, 350-51, 364-70 ; Rozea 1/18/02 Affidavit ¶¶ 4, 5, 10, 6; Rozea 9/10/02  Declaration, ¶¶ 4, 6, 7, 8, 9; Jefferson Dep. pp. 212-16; Sanders Dep. pp. 230, 242-43; Kennedy Dep. pp. 135-36, 222, 225, 231-36; Brazelton Declaration, Pl's. Ex. 24, ¶¶ 8, 9, 12; Scruggs Dep. pp. 60, 367-68; Kennedy Declaration, Pl's. Ex. 23, ¶ 18; Brazelton Dep. pp. 46-51, 94, 290.  Again, this evidence is admissible to show pretext, but does not help the plaintiff carry his initial burden of proving a prima facie case.

claiming his employer intentionally treated him less favorably due to his race must first establish a prima facie case of discrimination by showing: (1) he belongs to a protected class (2) and was subjected to an adverse job action (3) while similarly situated employees outside the protected class were treated more favorably and (4) he was qualified for his job. *Holifield v. Reno,* 115 F.3d 1555, 1561 (11th Cir. 1997).

### 1.    Job Assignments.

Cross generally claims the Roadway Collective Bargaining Agreement[5] was manipulated so as to assign African-Americans to the hardest and most labor-intensive positions. Pl's. Br. p. 46; Cross Dep.  pp. 68-89.  As to his own assignments, Cross claims he must go off his regular route and do the run to Scottsboro every Wednesday, when the regular driver, Brazelton, has

---

[5]Roadway and the Teamsters Union have a Collective Bargaining Agreement ("CBA") that governs many aspects of the employment relationship between the drivers and Roadway. (Pl's. Br. p. 13).  At Roadway's Huntsville terminal, assignments posted for bid are based on start times.  *Id.*; Plaintiff's Exhibits, Doc. 56, Ex. 1, Deposition of Ruben Cross, (hereinafter, "Cross Dep."), pp. 89-91.  Drivers are allowed to bid on assignments based on their seniority.  *Id.*, Cross Dep. pp. 94.  Even though the routes associated with the start times are not posted, employees know from experience that certain runs are associated with certain start times.  Pl's Br. pp. 13-14.  Only three persons are ahead of Cross on the seniority list.  Cross Dep. p. 90.

a day off.  Pl's.  Br. p. 16; Cross Dep. p. 97; Brazelton Dep. p. 25.[6]  He contends he bid on the route without knowing he would have to go to Scottsboro.  Cross Dep. pp. 97-102.  Cross also points to an occasion in July 1999 when he refused an assignment Rozea had given him because he felt the work had been distributed unfairly, and Shanks said Rozea should have fired Cross on the spot.  Pl's. Br. p. 14; Cross Dep. pp. 16-32.

Roadway argues that an undesirable job assignment does not constitute an actionable adverse employment action,[7] and that Cross cannot show he was treated differently than similarly situated employees outside the protected class or that Roadway's legitimate reasons for its actions are pretextual.  Def's. Br. pp. 5-6, 16-20.

The July 1999 incident does not support Cross's claim of discriminatory job assignments.  He testified he refused to do the work assignment and he cannot recall that he ever received any discipline as a result of the refusal.

---

[6]Brazelton submitted a declaration stating the run frequently requires hand loading of four to six twenty-eight foot trailers of hand freight, without assistance.  Pl's. Br. p. 15; Brazelton Declaration, Doc. 56, Ex. 24 (hereinafter, "Brazelton Decl.") ¶ 8.

[7]See *Shannon v. BellSouth Communications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)(reassignment not adverse action);  *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587-88 (11th Cir. 2001)(undesirable assignments not adverse action).

Cross Dep. pp. 16-32.[8]  Therefore, he was not subjected to any adverse employment action.[9]  Furthermore, Cross testified that white employees Jeff Childers and W. T. Smith were on the dock and available to do the work, but there is no showing these employees were similarly situated.

As to the contention that he had a difficult Scottsboro run on Wednesdays, Cross has not pointed to any similarly situated employee outside the protected class who was treated differently.  He testified that except for the easiest "H. D. Lee and Walmart" run, all the runs varied, so that they were "easy today and hard tomorrow."  Cross Dep. pp. 91-92.  He testified that he bid on a start time, not an assigned route.  Cross Dep. pp. 100-02.  He testified he is the Roadway driver with the most experience in driving to all the areas serviced by the Huntsville terminal.  Cross Dep. pp.

---

[8]Cross did have a meeting about the incident with Shanks, Massey and union steward W. T. Smith. *Id.*

[9]Although there is no bright-line test for what constitutes an adverse employment action, it is clear that not all conduct by an employer negatively affecting employment constitutes an adverse employment action.   *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1238 (11th Cir. 2001).   "'A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits.' " *Davis*, 245 F.3d at 1238-39, *citing Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)(discussing supervisor's vicarious Title VII liability for sexual harassment)(emphasis in original).

93-94, 144-45.  In response to questioning, Cross did not name any similarly situated Roadway employees outside the protected class who were treated differently.  Cross Dep. pp. 145-65.   In brief, Cross listed employees Clint Monrovie, Don Thomas, Jeff Smith, W.T. Smith, Larry Jones, Randall Boyd, and Jeff Childers as persons who were similarly situated to him and treated more favorably.  Pl's. Brf.  p. 47.  However, Cross did not point to any evidence that these drivers' routes never changed after their bid, that these drivers' routes were easier than his route or that they were, in any other respect, similarly situated but treated more favorably.

> To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. . . . In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

> 2.   Equipment Access.

Cross claims he was denied access to newer, better and/or rented equipment.  Pl's Br. p. 13, 17, *citing* Cross Dep. pp. 110, 129.   Cross

testified he was assigned to drive a new Ford Sterling, but asked to get his old truck back because he thought the new truck was hurting his shoulder. Cross Dep. p. 110. Cross also testified he bid on the Athens run for one week, but the Ryder rental truck that was typically used on the Athens run went to Cullman that week. *Id.* at 129.[10]

As to his claim about the Sterling, Cross testified he stayed with the new Sterling when Shanks said Cross should keep the truck and take care of it. Cross Dep. p. 108. Later, Shanks asked how it was going, and Cross told Shanks the shoulder had stopped hurting. *Id.* Cross testified he still drives the Sterling and had not asked for another truck. *Id.* at 108-10. The assignment of the new Sterling does not constitute an adverse employment action. *Davis*, 245 F.3d at 1238. Alternatively, Cross has not pointed to any similarly situated white employee who was treated less favorably. *Holifield*, 115 F.3d at 1562.

---

[10]Roadway contends that Cross's claim about the Ryder rental is time-barred because the events occurred in September 1999. Def's. Br. p. 14. The Title VII claims appear to be barred, but the Section 1981 claims may be viable. As discussed above, the claim is due to be dismissed because Cross has not shown the drivers were similarly situated.

Page 14 of 37

Cross testified the Ryder rental truck was desirable because it was equipped with power steering, air conditioning and a stereo, but the truck he drove otherwise had the same operational abilities. Cross Dep. p. 112, 128. Although he did not get the rental truck the week he drove the Athens run, he drove the Ryder rental to Scottsboro on one occasion, and he was offered the rental truck on another occasion but refused to take it. *Id.* at 121-24. Roadway contends Cross cannot show the employee who drove the Ryder truck for one week was similarly situated or treated more favorably in view of Cross's testimony that he also had opportunities to drive the truck. Def's. Br. pp. 19-20. Cross has not responded to this argument and there is no detail in the cited evidence showing the Ryder truck driver was similarly situated.

Finally, Roadway contends that assignment of equipment does not constitute an adverse employment action. Not all conduct by an employer negatively affecting an employee constitutes an adverse employment action; there must be some threshold level of substantiality that must be met for unlawful discrimination to be cognizable. *Davis*, 245 F.3d at 1238-39. "'A tangible employment action constitutes a *significant* change in

employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits.'" *Id.*, *citing Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)(discussing supervisor's vicarious Title VII liability for sexual harassment)(emphasis in original). Although the Eleventh Circuit has not spoken to the issue, several courts have said that assignment of inferior equipment is not an adverse employment action. *See Geer v. Marco Warehousing, Inc.*, 179 F. Supp. 2d 1332, 1341 (M.D. Ala. 2001)(improperly functioning cleaning equipment); *Jacob-Mua v. Veneman*, 289 F.3d 517, 522 (8th Cir. 2002)(inferior equipment); *Markel v. Bd. of Regents*, 276 F.3d 906, 911 (7th Cir. 2002)(plaintiff denied better equipment). Here, Cross claims he was denied the use of a truck for one week, but that the truck he drove that week was equally functional and he drove the desired truck on other occasions. His claim does not rise to the level of an adverse employment action.

For the stated reasons, Roadway's motion for summary judgment is due to be granted as to Cross's claim that he was assigned inferior equipment.

### 3.   Discipline.

Cross claims that in March 1998 he was disciplined by Shanks and lost safety points for an accident which he believed was not his fault.  Pl's. Br. p. 20; Cross Dep. pp. 216-27.  He testified he was backing his truck up and hit a pickup truck.  Cross Dep. pp. 216-27.  Roadway contends this claim is time-barred and that Cross cannot show any similarly situated white employees were treated differently.  Def's. Br. pp. 4-5, 14.

Under Title VII, an EEOC charge must be filed "within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e).  The statute of limitations for claims brought under 42 U.S.C. § 1981 is Alabama's two-year limitation period for personal injury claims.  *Moore v. Liberty Nat. Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001). Cross filed his EEOC charge on October 6, 2000.  Pl's Ex. 12.  The charge was amended on November 21, 2000, and February 27, 2001.  *Id.*   He initiated this action on September 20, 2001.[11]   Cross contends his discipline claim is

---

[11]The parties agree that any Title VII claims arising after April 9, 2000, and any Section 1981 claims arising after September 9, 1999, are timely.  Def's. Br. p. 14, Pl's. Br. p. 25.

Page 17 of 37

not time-barred because the statute of limitations can be equitably modified under a continuing violation theory.

The requirement that a claimant file a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling. *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir. 1994) (citations omitted). However, in determining whether a discriminatory employment practice constitutes a continuing violation, the Eleventh Circuit distinguishes between "the present consequence of a one time violation, which does not extend the limitations period, and the continuation of the violation into the present, which does." *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 448-49 (11th Cir. 1993), *citing Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir.1992). Cross's loss of safety points is a discrete act which occurred in March 1998. Although the effects of the loss continue into the present,

the violation itself did not continue.[12]  Accordingly, Cross's claim based on

the March 1998 discipline is time-barred.

Further, Cross named Jeff Smith and "Randall"[13] as white drivers who

had accidents but did not lose their safety points.  Cross Dep. pp. 228-30.

However, he did not know of any other Roadway driver having a "backing

accident," which is considered a preventable accident, who did not lose his

safety points.   Cross Dep. pp. 230-31.   Neither has he presented any

evidence in response to Roadway's motion showing that Smith and Randall

were similarly situated.  As discussed above, the plaintiff must show that he

and the employees are similarly situated in all relevant respects.  *Holifield*,

115 F.3d at 1562.

Accordingly, Roadway's motion for summary judgment is due to be

granted as to Cross's discriminatory discipline claim because the claim is

---

[12]Cross testified he will never qualify for a "million miles safe driving" award due
to the loss of points.  Cross Dep. p. 227.

[13]Probably Randall Boyd.  Pl's. Br. p. 20.

time-barred and because Cross has not pointed to any similarly-situated employee outside the protected class who was treated differently.[14]

B.    Hostile Work Environment.

1.    Admissibility of the Evidence.

Roadway contends that much of Cross's evidence is inadmissible hearsay or his own subjective beliefs and unfounded speculation. Def's. Br. pp. 14-16.

Hearsay is an out-of-court statement which is offered into evidence to prove the truth of the matter asserted. Fed. R. Evid. 801. As a general rule, the evidence in question in this matter consists of testimony from various co-workers that Rozea told them about remarks Shanks or Massey made during a meeting Rozea attended. Rozea's testimony about the remarks would not be hearsay,[15] if the out-of-court statements of Shanks and Massey are offered only to show the statements were made, not to

_____

[14]Cross pointed to additional evidence that, he claims, shows other black employees were disciplined more severely than white employees. However, he specified only the one instance in which he, Cross, was allegedly subjected to discriminatory discipline. Pl's. Br. pp. 17-20.

[15]But see discussion, *infra* regarding remarks heard by co-workers but not by the plaintiff.

prove the truth of the matter asserted. However, a deponent's testimony that Rozea told him that Shanks and Massey made such statements is offered to prove the truth of Rozea's statement, and is, therefore, inadmissible hearsay. The following evidence will not be considered because it is inadmissible hearsay: (1) Jefferson Dep., Pl's. Ex. 8, pp. 129-42 (testifying about what Rozea told him Shanks said); (2) Brazelton Dep., Pl's. Ex. 6, pp. 114-17 (testifying about what Rozea told him Shanks and Massey said); (3) Jefferson Dep., Pl's. Ex. 8, p. 154(testifying about what Cross told him a co-worker said); (4) Brazelton Dep., Pl's. Ex. 6, pp. 117-20)(testifying about what Cross told him a co-worker said); (5) Scruggs Dep., Pl's. Ex. 5, pp. 81-92 (testifying about what Rozea told him Shanks, Massey and co-workers said); (6) Kennedy Dep., Pl's. Ex. 4, pp. 118-24, 130-32 (testifying about what Rozea told him Shanks, Massey and a co-worker said); (7) Endsley Dep., Pl's. Ex. 7, pp. 111, 118, 168, 117-40 (testifying about what Rozea told him Massey said and about what Rozea and other drivers said about work

assignments);[16] (8) Rozea Dep., Pl's. Ex. 3, p. 206 (testifying about what Brazelton told him about Shanks).

Cross also relies, in part, on his EEOC charge to prove the merits of his hostile environment claim. Pl's. Br. pp. 3-7; Pl's. Ex. 12. As a general rule, this Court must consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" to determine if there is a genuine issue of material fact. Fed. R. Civ. P. 56. The EEOC charge is relevant to Roadway's argument about the timeliness of Cross's hostile environment claims. However, the charge itself is irrelevant to show the merits of Cross's claim. "On summary judgment, the nonmoving party [must] go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Accordingly, the EEOC charge

---

[16]Plaintiff also cited pages 158, 203 and 315 of Endsley's Deposition. Pl's. Br. p. 5. However, Endsley's testimony on those pages was not as Plaintiff represented in brief and is not relevant to the merits of Plaintiff's hostile environment claim. Endsley Dep. p. 158 (discussing anonymous letters to Roadway); p. 203 (discussing whether Endsley knew he had filed a separate lawsuit against Roadway); p. 315 (discussing whether Endsley knew the union contract prohibited discrimination and if he had ever been arrested).

will not be considered in reviewing the merits of Cross's hostile environment claim.

Cross heavily relies on the deposition testimony of co-workers regarding comments they heard or incidents they witnessed. Evidence of comments heard by other persons can be relevant in a Title VII case. A decisionmaker's routine use of racial slurs can be evidence that racial animus was a motivating factor in making a disciplinary decision. *See, e. g. Brown v. East Miss. Elec. Power Ass'n.*, 989 F.2d 858, 861-62 (5th Cir. 1993). Moreover, a plaintiff may have a viable hostile environment claim even if racial remarks were not directed at her. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995). However, a plaintiff in a hostile environment case must show that the harassing conduct was sufficiently severe or pervasive to alter the terms or conditions of his employment. "This requirement, as defined by the Supreme Court, contains both an objective and a subjective component." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002), *citing Harris v. Forklift Systems*, 510 U.S. 17, 21-22 (1993). Incidents unknown to the plaintiff cannot contribute to his subjective view of a hostile environment. *Edwards,*

49 F.3d at 1522. (Discussing incidents made known to the plaintiff after her termination, speculative incidents, statements made to third parties by fourth parties, and incidents cited without information as to when they were made, how they were made and when they became known to plaintiff). The following evidence will not be considered in evaluating Cross's hostile environment claim because there is no evidence he knew of the comments or incidents at any relevant time:[17] (1) Jefferson Dep., Pl's. Ex. 8, pp. 156-61(testifying about paper with racial jokes found on an unspecified desk, at an unspecified time, with no indication Cross had knowledge); (2) Brazelton Dep., Pl's. Ex. 6, pp. 121-25, 302-03 (threat made in '70's by persons no longer at Roadway and comments at unspecified times, with no indication Cross had knowledge); (3) Scruggs Dep., Pl's. Ex. 5, pp. 78-87 (comments heard in 1999 and 2000, with no indication Cross had knowledge); (4) Kennedy Dep., Pl's. Ex. 4, pp. 118-20, 126-28 (comment and joke on

---

[17]Cross submitted his declaration in which he stated he "learned of [racist] comments by [his] supervisors from a white supervisor and several of [his] co-workers." Declaration of Ruben Cross, Pl's. Ex. 2, ¶ 3. As with evidence submitted by the plaintiff in *Edwards*, there is no indication of how and when the comments were made known to Cross. *Edwards*, 49 F.3d at 1522. Without this context, these "statements made to third parties by fourth parties" are not relevant to Cross's hostile environment claim. *Id.*

unspecified date, with no indication Cross had knowledge); (5) Sanders Dep., Pl's. Ex. 9, pp. 304-08 (comment on unspecified occasion, with no indication Cross had knowledge);[18] (6) Rozea Dep., Pl's. Ex. 3, pp. 202-03, 239, 314-19, 449, 455, 457; Rozea 1/18/02 Affidavit, ¶¶ 14, 15, 19 (comments by supervisors, with no indication Cross had knowledge).[19]

Accordingly, the evidence considered in evaluating Cross's hostile environment claim will be limited to the following, cited in Cross's brief:

(1) On at least two or three occasions, Stanley Shanks asked Cross if Cross thought he was a racist. Cross told Shanks not to ask him that question, and testified that he thought Shanks was asking him to take sides in a dispute Shanks had with Endsley. Cross did not want to answer the question because he might then be fired or treated differently. Cross did not indicate when these encounters took place. Pl's. Br. p. 3; Cross Dep. pp. 79-82.

---

[18] On pages 4-5 of his brief, Plaintiff cited additional testimony of James Sanders. However, Sanders' testimony on those pages was not as Plaintiff represented in brief and is not relevant to the merits of Plaintiff's hostile environment claim. Sanders Dep., Pl's. Ex. 9, pp. 135-36, 139 (discussing opportunities to voluntarily leave work early).

[19] Plaintiff cited portions of Rozea's deposition that do not appear to be relevant to his hostile environment claim. Rozea Dep., Pl's. Ex. 3, pp. 178-80 (testifying he thought Shanks was racist).

(2) On one occasion, Shanks told Cross to look at him when he spoke. Cross testified he was looking at Shanks "off and on" while Shanks talked to him, but he was not looking at Shanks when Shanks made the remark. On another occasion, Shanks overheard Cross and other drivers talking about a bid, and began berating Cross for something he said. During the course of the interaction, Shanks told Cross to "be still." Cross testified he continued to gather his work tools until Shanks said "be still" again, and then Cross "froze." Pl's. Br. p. 3; Cross Dep. pp. 59-74. Cross testified that the time Shanks told him to "be still" made him upset because it reminded him of his father beating him. Pl's. Br. p. 3; Cross Dep. pp. 268-70.

(3) Cross stated in his declaration that "during his employment he heard a supervisor use the term 'nigger-rigging' in reference to an African-American co-worker." Pl's. Br. p. 3; Cross Declaration, ¶ 2. Cross has not stated when the incident occurred. *Id.*[20] However, Cross testified at his

---

[20]Cross also cited the testimony of Maurice Jefferson and Troy Brazelton in support of this allegation. However, Jefferson and Brazelton did not hear the remark. Rather, they testified that Cross told them about the incident. Pl's. Br. p. 3; Jefferson Dep., Pl's. Ex. 8, p.154; Brazelton Dep., Pl's. Ex. 6, pp. 117-20. As discussed above, the testimony has been excluded as hearsay. However, the Court examined the Brazelton and Jefferson evidence in an unsuccessful effort to determine when the incident might have occurred.

deposition that he never heard Shanks say anything derogatory about an African-American, except he once criticized a black city councilman for something about schools.  Cross Dep. pp. 57-58, 93, 351.  He testified he never heard Massey, Gordon, Lee, Taylor or Shotts say anything he considered to be racially offensive.  Cross Dep. p. 58.

(4) Cross stated in his declaration that he was "made aware" that Sean Scruggs saw two dolls hanging on a bulletin board and, although Scruggs complained to Shanks that the dolls were offensive, Shanks did not remove them for several weeks.  Pl's. Br. p. 3; Cross Declaration, ¶ 4.  Although Cross has not provided any evidence about when he "became aware" of the incident, Scruggs testified this incident occurred in June of 1999.  Pl's. Br. p. 3; Scruggs Dep., Pl's. Ex. 5, p. 103.  Cross's testimony about the incident was:

Q.  (By Mr. Gardner) Has there been any occasion, Mr. Cross, that you've seen any kind of doll or figure anywhere at the Roadway terminal?
A.  Any what now?
Q.  Doll. d-o-l-l. doll, or figure on a bulletin board or a dispatch board or anything else?
A.  I ain't seen the doll itself.  I just saw a picture, what – they had been talking about the doll.
Q.  You saw a picture of the doll.

Page 27 of 37

A. Somebody had took a picture of the doll.

Q. Okay.

A. I can't recall when. It's been like in the last year or so, couple of years. But I had – I didn't see the doll.

Q. And who was it that had the picture of the doll?

A. It was Scruggs.

Q. Scruggs. Okay. And from seeing it in the picture do you remember anything about it, what it looked like or anything?

A. Well, after he showed me the picture, you know, how like you can see things you don't see. After I seen the picture then I said, yeah, I remember it. I never paid it no attention.

Q. Okay.

A. But as far as me, you know, seeing it there – but after I seen the picture with it on the board I do remember seeing it after the picture. But it didn't dawn on me – like me saw it and you didn't see it. [sic]

Q. Yeah. Did Ms. Scruggs [sic] say anything to you about whether he had asked anybody to take it down or remove it or get rid of it?

A. He said he told – I can't remember if it was Gilmer – somebody he said something to about moving it. And he said that they didn't think much of it. And then he told the way he felt about it and they finally took it down.

Q. Did he tell you why it offended him or why he didn't like it?

A. Well, he said once because of the color it was and the way they had the – said something about a noose. What's a noose, like a rope?

Q. Uh-huh.

A. There's a noose like –

Q. That's what he told you?

A. Yeah, that's –

Q. Okay.

A. If I'm calling – if I'm saying it right, noose or loose or – like a rope, I call it.

> Q.  And what about the color of it?  What about the color?  What
> did that have to do with it?
> A.  I don't know.  If it wasn't like the noose and the dreadlocks
> or something about the hair or something he was saying aobut
> the doll.  Dreadlocks –

Cross Dep. pp. 211-15.

(5) Cross submitted his declaration in which he stated he "learned of [racist] comments by [his] supervisors from a white supervisor and several of [his] co-workers."  Pl's. Br. p. 4; Cross Declaration, Pl's. Ex. 2, ¶ 3.  As with evidence submitted by the plaintiff in *Edwards*, there is no indication of how and when the comments were made known to Cross.  *Edwards*, 49 F.3d at 1522.  Without this context, these "statements made to third parties by fourth parties" are not relevant to Cross's hostile environment claim.  *Id.*

2.    The Merits of the Hostile Environment Claim.

To establish a hostile work environment claim under Title VII, the plaintiff must show "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), *citing Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986).  To prevail

on a claim that he has been subjected to a racially hostile work environment, the plaintiff must present sufficient evidence to show: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as race; (4) the harassment was sufficiently severe and pervasive to alter the terms and conditions of employment and create an abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002).

Roadway claims Cross cannot show he was subjected to harassment sufficiently severe and pervasive as to alter the terms and conditions of his employment, there is no nexus between the alleged conduct and his race, the conduct was not subjectively or objectively offensive, and that it is not subject to liability because Cross never complained and Roadway responded promptly to other concerns.

Harassing conduct is severe or pervasive if it results in (1) an environment that a reasonable person would find hostile or abusive; and (2) an environment that the victim subjectively perceives to be abusive. *Harris,*

510 U.S. at 21-22. In evaluating the objective severity of harassing conduct, the court must consider the totality of the circumstances, including: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Miller*, 277 F.3d at 1276. "[C]laims of employment discrimination . . . present fact intensive issues. However. . . motions for summary judgment or judgment as a matter of law are appropriate to 'police the baseline for hostile environment claims.'" *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999)(en banc)(quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n. 8 (5th Cir. 1999)).

As discussed above, Cross presented admissible and relevant evidence tending to show: (1) Shanks asked Cross on two to three occasions if Cross thought he was racist, and this made Cross uncomfortable; (2) Once during a meeting including Shanks, Cross, W. T. Smith and Massey, Shanks told Cross to look at him when he was speaking. On another occasion, Shanks told Cross to "be still" when he was speaking, and repeated "be still" when Cross

continued to gather his work tools; (3) Cross stated in his declaration he heard a supervisor use the term "nigger-rigging" at some unspecified time, but testified he had not heard any of the present Roadway superviors use racially offensive language; (4) Cross saw a photograph of dolls Scruggs said were offensive, but Cross did not pay much attention to the dolls and was not able to say what about the dolls offended Scruggs; (5) At some unspecified time, Cross was told by a white supervisor and co-workers that they heard racially derogatory comments at the workplace.

The conduct of which Cross complains is not sufficiently severe or pervasive to alter the conditions of employment and create a working environment that a reasonable person would find hostile or abusive. *See Mendoza*, 195 F.3d 1247-53 (discussing sufficiency of sexually hostile work environment showing). In evaluating the objective severity of harassing conduct, the court must consider the totality of the circumstances, including, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with the employee's job performance. *Miller*, 277 F.3d at 1276. The evidence Cross presented does not meet this standard.

Most of the evidence offered in support of Cross's claim is evidence of "mere offensive utterances" and there is no evidence of physically threatening conduct. Neither has Cross claimed or shown there was any interference with his job performance as a result of the conduct.

There is no evidence showing the conduct was frequent. Cross could not put dates to most of the conduct, and has worked at Roadway since 1987. The one clearly racially offensive comment Cross heard was uttered at some unspecified time in the past. He heard other comments second-hand at some unspecified time. His four or five encounters with Shanks, including the two or three occasions when Shanks asked if Cross thought he was a racist, the occasion when Shanks said "look at me," and the occasion when Shanks said "be still," are not given any time-frame. In total, Cross was able to identify fewer than 10 incidents within his personal knowledge during his employment at Roadway. This cannot be said to be "frequent" harassing conduct.

Neither did Cross show any of the conduct he experienced was severe,

separately or in combination. There is no indication, other than Cross's

feeling of discomfort, that Shanks' telling him to "stay still" and "look at

him" was racially motivated.[21] He heard the "nigger-rigging" comment at

some point in time, but heard no racial pejorative from any of his present

supervisors. He attributed Shanks' questioning about his opinion of Shanks'

racial views to an attempt to get him to take sides in a dispute between

Shanks and Endsley, not to harassment because of race. Cross complains

about comments he heard second-hand and some unspecified time, but the

comments were not directed at him and he has not identified who told him

about the comments or when he was told.[22] Without some context showing

---

[21]Statements and conduct must be racially related before they are to be considered in determining whether the severe or pervasive requirement is met. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000)(discussing sexually hostile environment claim).

[22]Some of the comments set out in Cross's declaration are similar to comments Rozea claims he heard from Massey and Shanks, and Cross stated that some of the comments were made known to him by a "white supervisor." Making the inference most favorable to Cross, these comments must have been made sometime in the recent past since Rozea was employed at Roadway only a short time prior to the date Cross's EEOC claim was filed. However, Cross testified, "I don't pay Rozea no attention. I keep telling you that me and Rozea never did have a bunch of [things to say to each other.]" Cross Dep. p. 293. Therefore, if Rozea told Cross about the comments, Cross's testimony negates any inference that the knowledge significantly contributed to his subjective view of a hostile environment. *Edwards*, 49 F.3d at 1522.

Page 34 of 37

that the comments affected him, they cannot significantly contribute to his claim of an objectively hostile working environment. *See Miller*, 277 F.3d at 1276 (repeated incidents of verbal harassment that continue despite the employee's objections are indicative of a hostile work environment). He did not pay attention to the doll display, and so cannot show this was objectively or subjectively severe conduct.  Innocuous comments or conduct, even if it is boorish, is not considered in evaluating a hostile work environment claim, since Title VII is not a "general civility code." *Gupta*, 212 F.3d at 583.

Based on this record, a jury could not find Cross has been subjected to an objectively severe hostile work environment at Roadway.  Given the infrequency of the alleged comments, the dearth of evidence that they had any impact on Cross's day-to-day work, the absence of any personal threat, the minimal amount of objectively offensive activity, and considering the totality of the circumstances, this Court must conclude Cross did not experience harassing conduct that was so objectively severe and pervasive as to alter the terms and conditions of his employment.

### 3.    Roadway's Liability.

When a plaintiff shows harassment by a supervisor, and no tangible employment action is involved, the employer is vicariously liable unless it establishes an affirmative defense. *Frederick v. Sprint/United Mgmt. Co.,* 246 F.3d 1305, 1313 (11th Cir. 2001)(if the plaintiff satisfies his burden, the defendant-employer is entitled to assert the *Faragher-Ellerth* affirmative defense). *See Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998).[23]

At least part of Cross's hostile environment claim is based on harassment by supervisors Shanks and Massey. However, because Cross has not satisfied his burden of showing that he suffered severe and pervasive

---

[23]"The 'defense comprises two necessary elements:  (1) that the employer exercised reasonable care to prevent and promptly correct harassing behavior *and* (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm.'" *Id.,* *citing* Faragher, 524 U.S. at 807; *Ellerth,* 524 U.S. at 765 (emphasis in original). Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements. *Id.* The first element of the defense is usually satisfied if the employer has promulgated and disseminated an anti-harassment policy with a complaint procedure and has responded in a "reasonably prompt manner" to the employee's complaint. *Id.* at 1313-14. The defendant-employer's burden of proof on the second element is  usually satisfied if the employer can show the plaintiff-employee failed to follow its complaint procedures, unless the employee can show his non-compliance was reasonable in the circumstances. *Id.* at 1314.

harassment, the Court need not reach Roadway's argument that Cross unreasonably failed to take advantage of its anti-discrimination policy and attendant complaint procedure. *Frederick*, 246 F.3d at 1313.[24]

## VI.   CONCLUSION.

Roadway's motion for summary judgment will be granted as to all of Cross's claims.   A separate order in conformity with this opinion will be entered.

Done, this ___ 31ˢᵗ ___ of March, 2004.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

_____

[24]      Cross admits in brief that Roadway had an "Internal Review Process" which provided, in pertinent part:

. . .

If you become subjected to discrimination or harassment, you absolutely must not put up with it.  You can obtain a swift, honest investigation of the facts upon which you rely for any such claim or misconduct by writing to:
        Office of General Counsel,
        Internal Review Process,
        Roadway Express, Inc.,
        1077 Gorge Boulevard,
        Akron, Ohio 44309-0471.

. . .

Doc. 52, Affidavit of Stanley Shanks, Ex. 13; Pl's. Br. pp. 8, 40.